Filed 1/6/15  In re A.H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | |
| | D065870 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ012235) |
| v. | |
| D.H., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

D.H. (father) appeals an order of the juvenile court terminating the parental rights to his minor child, A.H. (minor). Father contends the court erred in finding that the beneficial parent-child relationship exception did not apply. (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).) Finding no error, we affirm the termination order.

FACTUAL AND PROCEDURAL BACKGROUND[2]

At the time of the termination hearing, minor was four years old and had spent most of her life in the juvenile dependency system. Minor had been removed from her parents' care three times in two years, which had resulted in more than 10 different placements. The record shows that minor's mother (mother), who is not the subject of this appeal, had a long history of drug and alcohol abuse and mental illness. Minor's parents also have a history of domestic violence, including 10-20 reported incidents of abuse, and both parents have lost custody of other children through the dependency system.

After minor's birth in 2009, she was removed from her parents' care due to mother's drug use. Approximately two years later, minor was again removed from her parents' care because of mother's drug use and because of domestic violence between mother and father. Minor was reunified with her parents in March 2011. Shortly thereafter, mother relapsed and minor was removed from her care. Mother left the state to receive substance abuse treatment.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Minor's counsel submitted a letter brief joining in the arguments and positions of plaintiff and respondent San Diego County Health and Human Services Agency. (See Cal. Rules of Court, rule 8.200(a)(5).)

In March 2012, the San Diego County Health and Human Services Agency (Agency) placed minor with father, after the court then found he had the ability to be a protective parent and he would not permit mother to have unsupervised contact with minor. However, in August 2012, father told an Agency social worker that mother moved back into the home in May 2012; that mother was again abusing drugs and alcohol while minor was in her care; that mother had obtained a restraining order (RO) against father as a result of alleged domestic violence, but that he and mother were still living together; and that their situation was "out of control" and the Agency should "take her [i.e., minor]" because he could no longer protect minor.

In mid-August 2012, the Agency filed a petition under section 300, subdivision (b) on behalf of minor. The petition alleged minor had suffered, or there was a substantial risk she would suffer, serious physical harm or illness based on the "inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." The court at the August 16, 2012 detention hearing ordered out-of-home detention for minor and supervised visitation for both parents.

The Agency's September 5, 2012 jurisdiction/disposition report recommended that minor remain in out-of-home care and that neither mother nor father be offered reunification services. That report included an interview between mother and an Agency social worker in which mother stated that she actually had moved back into the home in November 2011 and that father asked her then not to disclose this fact to the Agency; that father subjected her to "a lot of mental and emotional abuse" and slapped her across the face about four months earlier, although he had not "'beat her'" since minor was born; that

3

she was afraid of father and, as a result, obtained the RO; that father was verbally abusive and threw her out of the house when minor was present, which caused minor to act out; that father did not want anything to do with minor; and that minor did not want to be with father.

The September 5 report also included an interview with father where he discussed his relationship with mother. With regard to filing for divorce from mother, father stated, "'[D]id I file because I wanted to or did I file because you didn't want to give me my child back[?] I am not divorcing my wife, God put her in my life for a reason and I have to believe in her.'" Father admitted he and mother were then "still in a relationship." Father reported that mother was doing better, although he recognized she tended to relapse about every six months; that he and mother need to forgive each other and were learning to communicate as a couple; and that he was in counseling at his church. Father also reported that "he didn't get to know his daughter [i.e., minor and] that there was no bond."

As noted, the Agency social worker in the September 5 report recommended no reunification services for minor's parents. With respect to father, the report disclosed father had multiple criminal convictions, including assault with a firearm and attempted murder. Father's most recent conviction was in 2009 for inflicting corporal injury on a spouse, in violation of Penal Code section 273.5.

Regarding visitation, the September 5 report noted father visited minor once a week in a visit supervised by minor's caregiver. Father also called minor sporadically. The caregiver reported that when mother and father called, however, their main purpose was to complain about each other and not to speak to minor. As a result, the caregiver asked that father and mother not be allowed to call or text message the caregiver.

4

The September 5 report concluded father has "demonstrated that he cannot set limits and appropriate boundaries with the mother in the need to protect his daughter. The father has indicated that he has no plans to separate from the mother and the mother states that she has no current plans to separate from the father and the parents have continued to engage in a toxic relationship that is filled with name calling, belittling, hitting, lack of trust, lack of appropriate communication and placing [minor] in the middle of harm[']s way. The parents have indicated that they have the support from the church, however when times were tough the parents did not utilize their church support to assist them in providing services, guidance or any type of help with the mother[']s relapses and appropriate child care for the minor."

Despite the Agency's initial recommendation that father not be offered reunification services, the September 5 report included a handwritten notation showing the Agency reconsidered and recommended that father, but not mother, receive such services.

As relevant to this appeal, the Agency's October 1, 2012 addendum report recommended that father not be offered reunification services. The October 1 report discussed an incident of domestic violence involving mother and father that occurred in the early morning hours of September 16, 2012, when police responded to a call by mother that father was drunk inside the home. The arrest report stated police saw blood on father's hand, face and shirt. Father reported mother had struck him on the arm with a table lamp and then scratched the top of his head. Father denied touching mother during this incident. The arrest report also noted mother had no visible signs of injury.

5

When police arrived, they found mother was slurring her speech and smelled of alcohol. Mother initially claimed father hit her in the face; she then changed her story and stated that he tried to hit her in the face but that she blocked his blows. Mother also claimed father was "'beating on [her].'"

The October 1 report noted that when police responded to this incident, father initially said he did not know how he received the injuries on his head and suggested maybe he had been "attacked by a cat." Father then told police that mother had struck him on the arm with a lamp and scratched his head, after they had argued. According to father, earlier in the evening he found mother and her girlfriend drinking at a bar. Father admitted he drank with mother at the bar that night. Father also admitted there had been several other instances of domestic violence between him and mother that had not been reported.

Father told police that on the night of the domestic violence incident, he and mother began arguing about mother's drug use and the pending case involving minor. According to father, mother unexpectedly attacked him with a lamp when they got home. Mother also tried to hit father with a table. She then jumped on top of him and began punching him and using her acrylic nails to scratch his face and head. Police noticed several broken items on the floor, including pictures and a lamp, and saw blood drops throughout the home. Mother also had dried blood on her. Mother was later arrested.

In subsequent phone calls initiated by an Agency social worker regarding the incident, mother denied attacking father and instead claimed it was father who had attacked her. Mother claimed she was done with father, was going to seek an RO and

6

was packing up her belongings and moving out. Mother also stated that she did not want minor in father's care because he drank every night and had a "'chemical imbalance.'"

The October 1 report noted that on September 23, 2012 father called an Agency social worker at 11:22 p.m. and left a voicemail message stating that, as a result of the domestic violence incident, he also intended to seek an RO against mother. Father stated he was tired of trying to help mother stay sober, and he wanted her out of his life.

The October 1 report noted that on September 27, 2012 mother contacted an Agency social worker about visitation with minor. This report noted that during the conversation, mother told the social worker she and father were still living together.

With respect to father, the Agency in its October 1 report recommended against offering him reunification services. It noted father "has continued to make poor decisions and lacks judgment regarding the care of his children. . . . Regarding the minor[,] . . . the father has failed to provide a safe home for [her]," as minor has "been removed from the care of her parent(s) 3 times in a 2 year period of time." It thus concluded father was unable to protect minor because he was unable to set "limits and appropriate boundaries" with mother despite the fact they continue to engage in a "toxic relationship."

The Agency's October 30, 2012 addendum report recommended father undergo a psychological evaluation. That report included a summary of a conversation between minor's caregiver and an Agency social worker in which the caregiver reported that minor "says 'please tell CPS not to take me away.'" The October 30 report noted that minor had smeared poop on the wall and pooped in her pants, and that certain other behaviors of minor were "coming back," including screaming and yelling.

7

The October 30 report noted the Agency advised father of his case plan and the services it recommend he complete. Father indicated he had participated in services in the past and was aware of the need to complete them. Father was told that he would need to complete therapy, domestic violence and substance abuse services. That report also noted Father minimized the earlier domestic violence incident in which mother attacked him with a lamp: Father told an Agency social worker that he was not drunk on the night of the incident; that mother did not strike him; and that the police lied when they claimed there were blood droplets throughout the home. Father added that the police lied, just like the Agency social workers.

As noted, the Agency case plan prepared for father stated he was responsible for attending a 52-week domestic violence offenders program. Father also was to participate in individual therapy/counseling sessions to address among other issues his lack of insight into mother's substance abuse and his failure to adequately care for minor as a result, and in parenting and substance abuse classes/services. Finally, the case plan required father to complete a psychological evaluation.

The contested jurisdictional/dispositional hearing was held on December 7, 2012. At the conclusion of the hearing, the court sustained the petition, declared minor a dependent, removed custody from the parents and ordered minor placed in licensed foster care. The court ordered reunification services for father only and, as recommended by the Agency, ordered him to participate in counseling, submit to random drug testing and undergo a psychological evaluation.

The Agency's May 29, 2013 status review report recommended terminating father's reunification services. Father reported he and mother were communicating and

8

were "get[ting] along better."  Mother provided a different story, stating father was stalking her, she had no interest in reuniting with him and she felt unsafe in her own home because of him.  The May 29 report noted minor was then living in a licensed foster home, her "daily functioning" was improving and minor was learning what "positive behavior look[ed] like."

The May 29 report disclosed that father had enrolled in domestic violence classes and that, although he had completed 14 sessions and visited with minor weekly, he was "firm" regarding his intention to reunify with mother and did not understand the risk to minor of doing so.  The report noted father had made progress in therapy by taking the Agency requirements more seriously; by working to understand the triggers of, and learning to avoid the cycle that leads to, domestic violence; and by recognizing minor needed protection from potential harm or exposure resulting from mother's substance abuse.

Attached to the May 29 report was father's mid-December 2012 psychological evaluation.  The evaluator noted that father's "primary commitment continues to be maintaining the relationship with [mother], with the protection of [minor] consistently a second consideration.  There was little in the documentation reviewed, my interview with [father] or the psychological testing that gave any reason to believe that this is likely to change."  The evaluator also found it unlikely that father "would be truthful in his dealings with the [Agency] at such point as [mother] again behaved in ways which placed his daughter at risk."  The evaluator concluded, "it is quite unlikely that [father] can be relied upon to act as an appropriately protected parent."

9

The May 29 report also included summaries of communications between father and Agency social workers. In one conversation in April 2013, father stated that he was coming to terms with the fact he had abandoned mother during her recovery; that he and mother were lacking communication skills but were talking more; and that mother's relapse was his "'fault because of what, [he] was doing to her. If [he] was the husband that [he] should be to her, then maybe she wouldn't have relapsed.'" Father reiterated that when mother was not on pills, she was a "'good mother'" to minor.

In another conversation in mid-May 2013, father reported he and mother agreed to say "goodbye" to each other and it was then time for him to focus on minor. Father also indicated his therapy sessions were going well.

The May 29 report further noted that father visited regularly with minor; that in early April, mother had an unauthorized overnight visit with minor; and that during this same time period, mother and father together had an unauthorized unsupervised day visit with minor. With regard to the latter visit, when questioned neither mother nor father took any "responsibility as to the emotional risk that they had placed [minor] in to have a visit with both of her parents present." The report further noted minor's parents blamed the Agency for "everything" that was happening with minor.

With regard to the unauthorized overnight visit between minor and mother, the May 29 report noted that father viewed that visit as a "blessing"; that minor was not in danger; and that it was "good" for minor to spend time with mother alone and with both her parents at the same time. When questioned, father stated he did not go and pick up minor from mother because minor was "in good hands" and "was cared for and loved."

10

A few days later, an Agency social worker spoke to minor's caregiver who reported "they were back to square one with [minor] and tantrums" because of the visits. The caregiver reported that minor expressed concern about living with mother again, and worried that mother would "start drinking and smoking again."

The May 29 report concluded minor should not be returned to the care of father because he "has demonstrated numerous times that he does not have the ability to parent his daughter on his own," as shown by the fact that "he does not have the girth to stay away from the mother and to demonstrate that he can protect his daughter from harm or danger that the mother can afflict by her use of narcotics and alcohol." Although that report noted father was participating in services, it concluded he still lacked "insight as to the role that he has played in the relationship. It is eviden[t] that the father tells different people what he thinks they want to hear. The father has not been forthcoming with his therapist or his domestic violence counselor about the unsupervised visit that he had with the mother and the child. The father states that [he] is going to file for divorce/that he has filed for divorce. This is not the first time that the father has stated this. In fact during the last dependency the father had stated that he was filing for divorce from [mother]. When the [Agency social worker] confronted the father on 08/27/2012 he stated 'did I file because I wanted to or did I file because you didn't want to give me my child back. I am not divorcing my wife, God put her in my life for a reason and I have to believe in her.' Now the father states that he has no plans to re-unite with [mother] that their relationship is over[;] however, they continue to have contact via the telephone, [social media] and by texting. . . . [¶] . . . [¶] The parents want to blame the Agency for the actions of their daughter. What the parents failed to realize is that [minor] would not be a dependent if

the mother was not abusing alcohol and prescription drugs. That [minor] would not be a dependent if the father was able to protect [her] from the mother. The parents have made selfish choices that were in the best interests of themselves, not what was in the best interest of their child."

As a result, the May 29 report recommended the court make among others a finding that returning minor to the custody of father would create a substantial risk of detriment to the child's physical and emotional well-being because father had not made substantive progress with the provisions of his case plan. The Agency report further recommended the court terminate father's reunification services and set a section 366.26 hearing to determine an appropriate plan for minor.

The record includes a May 29, 2013 report by minor's court appointed special advocate (CASA). The CASA reported minor has had "a lot of upheaval in her short life which appears to have made her suspicious and wary of new people and situations," as reflected by minor's concern over the "badge" worn by the CASA while attending a visit between minor and mother. The CASA further reported when minor's routine is interrupted, minor has "difficulty coping appropriately, displayed in extreme tempter outbursts and lack of control of her toileting."

The CASA reported minor was thriving in her current placement. Minor's foster parents were willing to be considered a concurrent placement for minor, as the foster parents already had adopted both of their daughters. The foster parents reported to the CASA that minor was following the family rules regarding sharing, bedtime and playing nicely and that minor enjoyed preschool.

12

The CASA report noted that father's once-a-week visits with minor were appropriate. However, during one visit in late April 2013, it was reported father allowed minor to "secretly talk on the phone to [mother] when he took her to the bathroom," and he told minor not to tell anyone.

A May 29, 2013 Agency addendum discussed a telephone call between mother and an Agency social worker in which mother claimed father was stalking her and threatening to kill her. Mother disclosed she was scared for her safety and well-being. Father, in response, stated he visited mother in the hospital a few days earlier; that a few days before the hospital visit, he met and spent time with mother, including giving her money and taking her shopping; and that mother then blamed him for the dependency of minor. The Agency reiterated in this report its view the parents were involved in a "toxic relationship" and "always find themselves back together again in the ongoing tumultuous cycle of [their] relationship."

In a July 22, 2013 addendum, the Agency reconsidered its recommendation that father's reunification services be terminated after father's therapist disclosed in a treatment report that father had filed for divorce and was learning to "identify red flags in people who are relapsing." The treatment report also noted father recognized that having mother in his life was "'like playing Russian Roulette.'"

Regarding visitation, the July 22 addendum noted father had four "positive" supervised visits with minor between mid-June and mid-July 2013  However, during the last visit an Agency social worker reported minor played with father "as if he was her husband," including calling father "babe."

13

The October 9, 2013 CASA report prepared for the 12-month permanency hearing noted minor was thriving in her current placement, where two other adopted children resided, including one child that was roughly the same age as minor and was in the same preschool class. The CASA noted the three girls considered themselves sisters. According to the CASA, minor's placement "seems to provide the structure and consistency [minor] craves."

Minor's foster mother reported to the CASA that after minor returned from a parental visit, minor was "confused, weepy, and short-tempered." It was further reported that minor also asked her foster mother if the foster mother thought minor was going to go back and live with mother and father, as suggested by mother.

The CASA reported father's visits with minor were positive. Father and minor both seemed to enjoy the visits and their interaction was appropriate. When minor asked father questions, the CASA observed father gave minor short, but honest answers, including to difficult questions posed by minor such as, "[W]hy 'he and [mother] fight.'"

The CASA recommended the Agency give some consideration to offering mother reunification services to help mother maintain her sobriety, improve her parenting skills and avoid domestic violence, "especially now that she and [father] say they are together and planning to co-parent [minor]."

The Agency's October 9, 2013 status review report disclosed mother and father "have rekindled their relationship with one another and are residing together. The address as to their residence is unknown as they are residing with friends and the friends do not want the information released. The mother has reported that she and the father are in the process of locating an apartment" to move into.

14

The October 9 Agency report confirmed that minor was asking when she would return to living with father and mother. Minor stated her parents had moved in together, and minor was going to live with them soon. When questioned, minor indicated she learned this information from mother and father. The Agency social worker found it concerning that mother and father were speaking to minor about their personal life and about minor coming home to live with them as a family.

The October 9 Agency report also noted that father exceeded the number of allowed absences for his domestic violence classes; that father had not been honest with the facilitator of those classes regarding his relationship with mother; and that father "stated that he realizes he cannot reunite with [minor] if he is with [mother]. Subsequently the father was terminated due to attendance and dishonesty with the program." The Agency concluded that it would be a detriment to return minor to father's care, inasmuch as he had demonstrated on myriad occasions the inability to parent minor alone and the inability to protect minor from harm or danger inflicted by mother due to her dependence on drugs and alcohol. Although father participated in services, the social worker noted father had not gained any insight "as to the role that he has played in the relationship between him and the mother." As a result, the Agency also recommended terminating father's reunification services.

The record includes a supplemental report by the CASA. In that supplemental report, the CASA noted mother's visits with minor had been suspended because mother had missed three visits in two months. That report also noted father had been asked not to return to his domestic violence classes because of absenteeism. Father reported he missed the classes because of his work schedule.

15

In connection with the 12-month review hearing, the Agency submitted an addendum report dated November 6, 2013. That report confirmed that mother and father were back together. It noted that, per minor's foster parents, minor was having "screaming fits and anger" and her behavior was disrupting their two daughters; that minor had a "complete breakdown" which started over a toy; that minor was throwing herself against the door of her bedroom during timeouts; and that, as a result, the foster parents requested minor be removed from their home because minor's behavior was "'severely disrupting'" their family.

During a follow-up conversation between an Agency social worker, on the one hand, and mother and father, on the other hand, the social worker explained minor's placement was being changed due to minor's disruptive behavior. Father, however, stated minor was being removed from her current placement because of "physical abuse." The November 6 report noted father and mother continued to blame the Agency for minor's poor behavior and refused to acknowledge their role in the multiple removals of minor from their care.

The November 6 report noted that father received two years and almost five months of reunification services during the initial and subsequent removal of minor from her parent's care; that, in the most recent dependency proceeding, he has received one year and about three months of reunification services; and that, combined, he has received services for about three years seven months. Despite receiving such extensive services, the Agency noted father had "yet to gain insight," the "knowledge" and the "skills as to how he can safely protect [minor] from people who are abusing drugs and alcohol."

16

At the contested 12-month review hearing, after hearing the evidence, including the reports and their attachments, the testimony of father's therapist and an Agency social worker, and after considering the extensive services already provided father, the court found the return of minor to the custody of father "would create a substantial risk of detriment to the child's physical or emotional well-being"  The court also found that "reasonable services have been provided to or offered [father] which were designed to facilitate the return of [minor] to him and alleviate or mitigate the causes which necessitated the child's placement in foster care"; that, while father has made "some progress" in complying with the case plan, he has not made "substantive progress" based on the issue that exists between father and mother and their relationship; and that, because there "is not a substantial probability that the child will be returned to the physical custody of the father within the next three months -- that will be by the 18-month mark -- which is sometime in mid-February 2014," father's reunification services were terminated.

In the Agency's March 17, 2014 section 366.26 report, it recommended the court order a permanent plan of adoption for minor.  That report noted mother had been named as a witness in a shooting incident that occurred in San Diego in early December 2013. An officer who interviewed mother in connection with that incident reported mother smelled of alcohol and her behavior was suggestive of being under the influence.  In addition, the March 17 report noted mother had been arrested in late December 2013 in Florida and, as of late February 2014, mother remained incarcerated.

With respect to father, an Agency social worker acting as an "adoptions worker" spoke briefly with father in early January 2014.  Father stated "'[t]hings have changed a

17

lot'" between him and mother. The March 17 report disclosed the adoptions worker left a message for father on January 6, asking he return the call. When father did not call back, the adoptions worker contacted father on January 9. During that conversation, father stated he was in the process of divorcing mother because she took a bus to Florida to pursue a relationship with a former boyfriend.

The adoptions worker attended a one-hour visit between father and minor in mid-January 2014. Per the March 17 report, the adoptions worker noted that father and minor were comfortable together; that minor called father "'Daddy'" when she first saw him; that, at the conclusion of the visit, minor went to the prospective adoptive mother who had been caring for minor since early November 2013, stating, "'Hi Mommy'"; and that minor left happily with her current caregiver. The adoptions worker did not observe any crying, sadness or any other behaviors from minor indicative of emotional distress when minor and father parted.

The adoptions worker reported after the visit she asked father about what he thought was the best permanent plan for minor. The March 17 report noted father "appeared to take a non-committal stance as he struggled to articulate a definitive response" to the question, at one point appearing supportive of adoption with minor's current caregivers, and at another point stating he wanted minor back. Father disclosed he was concerned about whether he could finically support minor, as he was already struggling to pay monthly child support to his two nondependent children.

The March 17 report included a summary of a conversation between minor and the adoptions worker that took place during a home visit in February 2014. The adoptions worker asked minor about having a "forever family." Minor in response asked, "'Will I

18

go back with my mommy [i.e., mother]?'"  Minor, however, did not inquire about living with father, and when asked where she wanted to live if it was not with mother and father, minor responded, "'Here with my mommy and daddy here.'"  The adoptions worker noted in the March 17 report that minor's caregivers were "excited and enthusiastic to make [minor] a permanent member of their family" through adoption and that minor had developed a "bond to both her prospective adoptive parents and her older sister."  The Agency thus recommended the court terminate the rights of the birth parents and order a permanent plan of adoption for minor.

The March 17, 2014 CASA report also recommended that minor remain in her current foster placement and that adoption be selected as the permanent plan.  The CASA noted that minor's current placement was "providing [minor] with love, stability, and the consistency that [minor] needs in order to feel safe and protected"; that minor in return appeared grateful; and that minor referred to her foster family members as "'Mommy,'" "'Daddy'" and "'Sissy'" and wanted to be a part of their lives as much as they wanted to be a part of her life.

The Agency's April 21, 2014 addendum noted minor had two visits with father that appeared to go smoothly.  However, when the adoptions worker followed up with minor's caregivers regarding minor's behavior after the visits, they "noticed a significant increase in overall defiant and anxious behaviors" by minor.  After one of the visits, minor told the caregivers that father "'said the Court says I will go back to live with him'" and that he also told minor, "'We don't have to go to [a restaurant] anymore, we can go to my house now.'"  Minor also reported she and father argued when minor said she did not

19

want to go to father's home for visits, but instead wanted the visits to continue at the restaurant. In response, father allegedly told minor, "'It's all your fault.'"

The adoptions worker stated in the April 21 report that, in her opinion, a parent-child bond did not exist for minor towards father; that, while minor enjoyed spending time with father, their relationship did not rise to that of a parental role; and that it was apparent that minor looked to her caregivers as her primary parental figures and they were the ones minor turned to in order to meet her physical and emotional needs.

At the April 28, 2014 contested hearing, the court received into evidence the additional Agency reports and heard the testimony of the adoptions worker, who also was separately cross-examined by father and mother. The adoptions worker opined that the benefits minor would receive from adoption outweighed any detriment she would incur if father's parental rights were terminated.

Specifically, the adoptions worker opined that, although there was a "relationship" between minor and father, there was not a "strong level of attachment" of minor to father. The adoptions worker based her opinion on observations of minor's behavior both before and after visits with father. The adoptions worker also noted that minor appeared to enjoy the visits and accepted that they happen. The adoptions worker also that, when the visits ended, minor returned to the home of her caregivers, "her family, where she has formed a strong bond both to her prospective adoptive parents and to her foster sister in the home."

The court admitted into evidence the stipulated testimony of father. He testified that he no longer was in a relationship with mother; that they have not spoken since December 2013; that he has no intention of allowing mother back into his life; that he did

20

not make the statements attributed to him after his visits with minor; that he loved minor and he wanted his parental rights to remain intact so they could work on "improv[ing their] father/daughter relationship" so that minor could return living with him.

After hearing closing argument, including rebuttal, the court found by clear and convincing evidence that minor was adoptable. The court found minor's current caregivers were "committed" to adopting minor and found there were about 41 families in San Diego that otherwise would be willing to adopt her.

The court next turned to the issue of the parent-child beneficial exception. As relevant here, the court found father had "maintained regular contact and visitation with the child" for purposes of section 366.26, subdivision (c)(1)(B). The court also found that father was gracious, warm and appropriate with minor during the visits and that "any adult that would provide that kind of care and attention and comfort to a child and support to a child, a child would benefit from a continuing relationship."

The court next addressed whether there was a "compelling reason that the court would think that this child would be harmed if the relationship" with father was terminated. The court framed this issue as follows:

"This is a multifactorial analysis that is not only assisted by the statute itself but by the case law that has interpreted the statute, and here is where we would analyze two things, what it means -- what the parent/child bond means, as I've stated before; and, No. 2, when we get down to it, the second criteria, the second definitional assistance the appellate court has given us is whether or not the child . . . would benefit more by being in the prospective adoptive home than being with the parents." In further analyzing this

21

issue, the court noted the issue was somewhat, but not quite, related to the "best interest of the child."

The court noted father had a prior dependency history with children being lost to the system; that minor had been in the dependency system for most of her life, beginning in 2009; and that, as a result, minor had lived out of the parent's home and away from father for most of her life. The court found these facts relevant to the analysis of the parent/child bond for purposes of this exception.

Focusing on the nature of the relationship between minor and father, the court noted that for most of minor's life, father had not provided minor with housing, care, education, daily love, food, and comfort; and that, as such, the relationship between father and minor was similar to that of "a benevolent visitor who is named . . . 'Daddy.'"

Next, focusing on the nature of the relationship between minor and her foster family, the court found it was "very good." In addition, the court found that minor needed to be in a "structured home environment with predictable routines"; that minor had been in a "nightmarish scenario" of being in multiple placements during her young life; and that minor needed to know "for sure what her future's going to be" and who will be her "family because of all of this instability and movement and irregularity in terms of her living circumstances . . . ." As a result, the court found there was no "compelling reason why this child's going to be harmed if the parent/child bond is terminated." It thus found "by clear and convincing evidence that the child would be better off in the adoptive -- prospective adoptive home" than with father.

DISCUSSION

Father contends the court erred by rejecting his claim under section 366.26, subdivision (c)(1)(B)(i) that the beneficial parent-child relationship exception to adoption applied. We disagree.

"'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

"Once the court determines the child is likely to be adopted, the burden then shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'" (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.)

Here, there is no dispute that minor was likely to be adopted and that father maintained regular visitation and contact with her, which findings, we note, are supported by substantial evidence in the record. (*In re S.B.*, *supra*, 164 Cal.App.4th at pp. 296-297.) As such, the issue in determining the applicability of the beneficial-relationship exception is whether father met his burden of establishing a "compelling reason" that

23

minor would "benefit" from a continuing relationship with father. (See § 366.26, subd. (c)(i)(B)(i).)

"The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.] No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

"The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575–576.)

Although findings made pursuant to the exception must be supported by substantial evidence, a court exercises its discretion in weighing the evidence and in

24

determining whether there is a compelling reason that termination of parental rights would be a detriment to the child. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315 [noting it is a "'quintessentially' discretionary decision" for a court to "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption"].)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.'" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

The record in the instant case shows that minor lived with her father for less than a year, despite the fact minor was four years old at the time of the section 366.26 hearing; that minor, in her young life, already had been removed from her parent's care three times, which resulted in more than 10 different placements; that, in the most recent dependency proceeding, which is the subject of this appeal, the Agency removed minor from her parent's care in August 2012, and, thus, at the time of the section 366.26 hearing, minor had not lived with father for almost two years; that, although father routinely visited minor, those visits were supervised, usually lasted no more than one or two hours and took place no more often than once a week, and sometimes less often; that, when the supervised visits between minor and father ended, minor neither showed nor

25

expressed any sadness or displayed any other behaviors suggestive of distress; that, after visiting with father, minor "happily" returned to the care of her foster parents/family; that, when the Agency adoptions worker spoke to minor shortly before the section 366.26 hearing about having a "forever family," minor at no time inquired about living and/or being reunited with father, instead asking only about mother and confirming if that was not possible, she wanted to live with her foster "mommy" and "daddy"; that, on visits with father, minor sometimes treated him "as if he was her husband," rather than her father; and that the adoptions worker opined there was not a "strong level of attachment of minor to father."

From the foregoing, we conclude substantial evidence supports the court's finding that father did not show he occupied a "'parental role'" in minor's young life (see *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621) and that father's relationship with minor was akin to that of "a benevolent visitor who is named . . . 'Daddy.'" (See *In re I.R.* (2014) 226 Cal.App.4th. 201, 213 [noting that "[e]ven frequent and loving contact is not sufficient to establish this benefit absent a significant, positive emotional attachment between parent and child"]; *In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581 [noting that "'on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong"'"].)

Moreover, the record amply supports the finding that father could not establish that his relationship with minor promoted the well-being of minor to such a degree that it

outweighed the well-being minor would gain in a permanent home with new, adoptive parents. (See *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

On the one hand, the record shows that time and time again father failed to recognize the need to be a protective parent for minor and put minor's interests and needs above his own; that father instead continually demonstrated his primary commitment was to mother and his protection of minor was a secondary consideration; that, based on father's psychological evaluation, it was unlikely father would ever change even though he repeatedly recognized his relationship with mother put minor at substantial risk; that, although father repeatedly stated he was through with mother and intended to divorce her, father and mother always ended up back together; that father lacked the skills to safely parent *and* protect minor, despite receiving services for about three years and seven months; that father believed mother was a "good mother" to minor when mother was not using drugs and often blamed the Agency and/or others for the dependency of minor and mother's problems; and that minor tended to act out after visits, including smearing feces on the walls and throwing tantrums and, shortly before the section 366.26 hearing, engaging in defiant and anxious behaviors after a visit with father.

On the other hand, the record shows that, in the months leading up to the section 366.26 hearing, minor was thriving in her then-current placement with her perspective adoptive family; that, as noted, minor referred to her perspective adoptive mother and father as "Mommy" and "Daddy" and their child, her perspective adoptive sister, as "Sissy"; that, per the Agency and minor's CASA, minor's then-current placement provided minor with the love, stability and consistency minor needed to feel safe and protected; that minor turned to her perspective adoptive family to meet minor's physical

27

and emotional needs; and that minor's perspective adoptive family were "excited and enthusiastic" to make minor a permanent member of their family.

This evidence easily supports the finding that the benefit of minor continuing her relationship with father was outweighed by the benefit of minor living in a permanent home with new, adoptive parents. (See *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

Father nonetheless contends the court misapplied the test to establish the beneficial-child exception to termination of parental rights. We disagree. Although the record shows the court found that father was gracious and warm with minor and that as such, "any" adult who provides such care would be a benefit to "a child," the record shows the court properly went on to focus on the nature and quality of the bond between father and minor and also whether minor would benefit from continuing in her relationship with father in contrast to having a permanent home with her prospective adoptive family.

We thus conclude the court ultimately applied the proper test and analyzed the requisite factors in determining the beneficial parent-child exception did not apply in this case. That is, although the court appeared to recognize that "'[i]nteraction between natural parent and child will always confer some incidental benefit to the child" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555), importantly, it further recognized that the bond between a parent and child, and the benefit of continuing that relationship versus terminating parental rights and placing child in a permanent home, were key analytical considerations in determining this exception did not apply in this case.

Finally, it is axiomatic that reviewing courts will "'uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court

reached its conclusion." [Citation.] "It is judicial action and not judicial reasoning which is the subject of review."'" (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.) Here, as noted, substantial evidence supports the determination that father did not satisfy his burden to show the beneficial parent-child relationship exception applied in this case.

DISPOSITION

The order terminating father's parental rights is affirmed.

_____

BENKE, Acting P. J.

WE CONCUR:


_____

NARES, J.


_____

McDONALD, J.